# In the United States District Court
# for the Southern District of Georgia
# Brunswick Division

CANDY CRAFT CREATIONS, LLC,,

    Plaintiff,

    v.

GREG GARTNER, GARTNER STUDIOS, INC., and TYLINA FOOD PRODUCTS CORPORATION,

    Defendants.

CV 212-091

## ORDER

By all accounts, Plaintiff Candy Craft Creations' fondant product, Fondarific, revolutionized cake decorating for professional cake decorators and hobbyists alike. Lois Judy and Laura Darnall, the women behind Candy Craft Creations, thought they had hit it big when Defendant Greg Gartner, from Gartner Studios, approached them to discuss an exclusive supply and distribution agreement for the smooth, pliable, sheet-like cake icing they had developed. The deal was supposed to catapult Fondarific into the national cake-decorating market, complete with distribution agreements from big-box stores like Michaels and Wal-Mart and endorsements from television personality Duff

AO 72A
(Rev. 8/82)

Goldman, executive chef of the famed Charm City Cakes and star of Food Network's reality television show "Ace of Cakes."

However, while the parties discussed the possibility of an exclusive supply agreement, they never put that agreement in writing. Instead, the parties operated for a time under open purchase orders. After Judy and Darnall had worked closely with Greg Gartner and Gartner Studios for some time, Defendants stopped agreeing to the open purchase orders. Plaintiffs then watched with disappointment as Defendants rolled out their own strikingly similar fondant product—"Fontastic"—under the same endorsement deal with Duff and the same distribution agreements with Michaels and Wal-Mart that they had hoped would make Fondarific the fondant of choice in homes and bakeries across the nation. Candy Craft had reason to believe that, in producing and selling "Fontastic," Defendants stole not only the trade secrets behind Fondarific, but its profitable ascendance in the cake-decorating market as well.

In its Complaint, Plaintiff levels fourteen causes of action against Defendants: misappropriation of trade secrets (Count I), fraud (Count II), breach of contract (Count III), violations of the Lanham Act and the Uniform Deceptive Trade Practices Act (Count IV), breach of fiduciary duty (Count V), breach of implied covenant of good faith and fair dealing (Count VI), unjust enrichment (Count VII), promissory estoppel (Count

VIII), equitable accounting (Count IX), tortious interference with business and contractual relations (Count X), civil conspiracy (Count XI), injunctive relief (Count XII), punitive damages (Count XIII), and attorney's fees and expenses of litigation (Count XIV). <u>See generally</u> First Am. Compl., Dkt. no. 45 ("Complaint").

Defendants have filed two dispositive motions presently before the Court: a Motion for Judgment on the Pleadings (Dkt. no. 234), and a Motion for Summary Judgment (Dkt. no. 235). There are also several evidentiary motions before the Court: Defendants' Motion to Strike Plaintiff's Errata Sheets (Dkt. no. 258), Defendants' Motion to Strike the Affidavit of Stuart Bromley (Dkt. no. 287), and Defendants' Objections to Portions of the Magistrate Judge's August 27, 2014 Order (Dkt. no. 330).

The rulings on the various nondispositive motions are as follows:

- Defendants' Motion to Strike Plaintiff's Errata Sheets (Dkt. no. 258) is **DENIED,** but the Court will not consider the errata sheets for purposes of determining whether a material issue of fact exists on Defendants' motion for summary judgment;

- Defendants' Motion to Strike the Affidavit of Stuart Bromley (Dkt. no. 287) is **DENIED;**

- Defendants' Objections to Portions of the Magistrate Judge's August 27, 2014 Order is **DENIED.**

For the reasons stated below, the rulings on the dispositive motions for the various claims are as follows:

- Count I, misappropriation of trade secrets: summary judgment is **DENIED;**

- Count II, fraud: judgment on the pleadings and summary judgment are **DENIED;**

- Count III, breach of contract: summary judgment is **GRANTED** as to Plaintiff's claim that Defendants breached an exclusive supply agreement; summary judgment is **DENIED** as to Plaintiff's claim that Defendants breached a nondisclosure agreement;

- Count IV, violations of the Lanham Act and the Uniform Deceptive Trade Practices Act: judgment on the pleadings is **GRANTED** by Plaintiff's concession;

- Count V, breach of fiduciary duty: judgment on the pleadings is **DENIED;**

- Count VI, breach of implied covenant of good faith and fair dealing: judgment on the pleadings is **GRANTED** by Plaintiff's concession;

- Count VII, unjust enrichment: judgment on the pleadings is **DENIED;**

AO 72A
(Rev. 8/82)

- Count VIII, promissory estoppel: judgment on the pleadings is **DENIED**;

- Count IX, equitable accounting: summary judgment is **DENIED**;

- Count X, tortious interference with business relations and contractual relations: judgment on the pleadings is **GRANTED** by Plaintiff's concession;

- Count XI, civil conspiracy: judgment on the pleadings is **GRANTED** by Plaintiff's concession;

- Count XII, injunctive relief: summary judgment is **DENIED**;

- Count XIII, punitive damages: judgment on the pleadings is **DENIED**;

- Count XIV, attorney's fees and expenses of litigation: summary judgment is **DENIED**.

## FACTUAL BACKGROUND

### Inception of Candy Craft and Fondarific

In 2003, Laura Darnall ("Darnall") created a substance she called "Candy Claydough," an edible dough that children could use for various projects. Dkt. no. 155-6 ("Darnall Dep."), 13:16-20, 18:13-17, 22:4-12. She began to sell Candy Claydough through a business called Earth's Treasures in 2005. Id. at 22:17-21. A couple of years after Darnall created Candy Claydough, she met Lois Judy ("Judy"), whose daughter played on the same soccer team as Darnall's. When the two would meet on

the sidelines, they would discuss Candy Claydough and Darnall's attempts to market it. These conversations merged into discussions of the two becoming business partners, and Darnall and Judy eventually began working on a common venture in November of 2007. Id. at 65:19-68:9. This venture came into being on January 7, 2008, and was called Candy Craft Creations. Id. at 65:2-10.

Judy and Darnall offer inconsistent testimonies regarding when Fondarific was actually created relative to when Candy Craft was formed. Darnall contends at one point that, as of January 7, 2008, Fondarific had not yet been developed. Darnall says that while they were working on improving Candy Claydough throughout early 2008, the recipe for Fondarific, which is still used today, was not completed until about mid-2008. Id. at 118:21-119:1. However, Darnall also agreed that "the concept, the idea, and the product Fondarific was created from the Candy Claydough, and then after that Candy Craft Creations was formed as a legal entity." Dkt. no. 245 ("Darnall 30(b)(6) Dep."), 9:11-15. But moments after this concession, she clarifies that she and Judy developed Fondarific from Candy Claydough "after we incorporated [our] LLC Candy Craft Creations." Id. at 10:11-13. With similar ambiguity, Judy stated in her 30(b)(6) deposition on behalf of Plaintiff Candy Craft that Darnall developed the proprietary recipe "in 2008 when we joined up. . . . Or maybe

late 2007, 2008, because we—before we actually signed o[u]r legal LLC paperwork we had already begun kind of, sort of." Dkt. no. 243 ("Judy 30(b)(6) Dep."), 69:2-9. Suffice it to say, Fondarific was developed sometime around Candy Craft's legal inception.[1] On March 1, 2008, Darnall and Judy entered into the "Operating Agreement of Candy Craft Creations, LLC." See Dkt. no. 235-2 ("Operating Agreement").

**The Negotiations between Gartner Studios and Candy Craft**

In May 2009, Plaintiff received an email from an agent for Duff Goldman, the celebrated pastry chef and star of Food Network's reality television show "Ace of Cakes." The email expressed interest in entering into a branding relationship with Candy Craft for a private-label brand of Fondarific. Later that year, in October, a project manager for Defendant Gartner Studios emailed Plaintiff stating that she had received Candy Craft's contact information from Goldman's agent. The project manager said that Gartner Studios was developing a marketing program with Duff Goldman to use his image for baking products, and inquired as to whether Candy Craft was selling Fondarific under its own label. Compl. ¶¶ 26-29.

---

[1] Plaintiff tries to clarify Jody's and Darnall's testimonies with errata sheets, the testimony of which would show that Fondarific was developed *after* Candy Craft's legal inception. As discussed in Part II below, these errata sheets will be admitted but the Court will not consider them insofar as they create a material issue of fact in response to Defendants' Motion for Summary Judgment and, particularly, Defendants' argument that Candy Craft does not have standing to bring this suit because Fondarific was developed before it was created and the intellectual property rights to Fondarific were never transferred to Candy Craft.

On December 3, 2009, Gartner visited Candy Craft's facility
to discuss the possibility of an exclusive supply agreement. Id.
¶ 30; Dkt. no. 267-1, p. 14 (email confirming that "[b]oth
Fondarific and Gartner Studios are interested in entering a
mutual exclusive supplier agreement."). Before entering Candy
Craft's office area, Gartner, on behalf of Gartner Studios,
signed a "Non-Disclosure and Confidentiality Agreement." See
Dkt. no. 45-2 ("NDA"), pp. 32-35. In the NDA, which prevents
Defendants from using any of Candy Craft's confidential
information gained in the course of the parties' dealings for
their own exclusive advantage, "Confidential Information" is
defined as certain information pertaining to the recipe,
customer and supplier data, financial information, and other
information regarding the development, production, marketing,
and distribution of Fondarific. Id. Particularly, the agreement
states:

> To be defined as "CONFIDENTIAL INFORMATION" under this
> Agreement and eligible for protection described
> herein, such information, if disclosed in printed or
> written form, except the patent application, must be
> labeled or stamped "CONFIDENTIAL INFORMATION" by
> Disclosing Party, and shall also include verbal
> communications subsequent to the date hereof which,
> although not containing a confidential legend is
> described as confidential to Disclosing Party and will
> be reduced to writing within ten (10) days of said
> verbal communication.

Id. ¶ 1.

Later that week, the parties exchanged and signed a Letter of Intent. See Dkt. no. 267-1, pp. 25-26. The Letter of Intent was non-binding, and established that the parties contemplated negotiations that would culminate in an exclusive supply agreement for Fondarific. Id. The letter laid out the general terms of the agreement that the parties anticipated to include in an official agreement at a later date. Those terms included, in part, the following conditions: Gartner Studios would be the exclusive distributor of Fondarific to chain retail stores; Candy Craft would maintain its existing independent and bakery customer base; the agreement would be for one-year terms that would automatically renew for four years; and the supply and distribution agreement would be exclusive as long as Gartner Studios made certain minimum purchases each year. Id. The agreement also included an "Ultimate Termination" clause, stating that "If definitive Agreements have not been executed by the parties by Jan[uary] 15, 2010, this Letter of Intent will terminate automatically, unless it is extended by written agreement signed by duly appointed representatives of both parties. . . . We look forward to working with you to complete this transaction." Id.

Around this time, Gartner sent an email to Judy stating:

I hope you guys are as excited as we are here. Life is full of uncertain[tie]s, but my whole life I have trusted my gut. . . . My belief is we will make it

through anything together as long as we always take care of each other. This is the spirit I approach my relationships with and is a huge reason why we have been successful. I know we will be successful with this, I am trusting my gut with both of you.

Dkt. no. 267-1, pp. 28. The parties continued to discuss the terms of an agreement through December 2009 and January 2010. See Dkt. no. 267-1, pp. 16-18. However, the parties were unable to come to a written agreement, and on the day before the Letter of Intent expired Darnall and Judy emailed Gartner, saying:

As you know being a business man, trust is great, however being a new company we have a lot at stake here. We are pursuing a larger facility and investing in machines, etc. to move forward with this venture. It is imperative that we have some type of contract in place prior to shipment because the letter of intent expires tomorrow. We realize that you are busy this is important to us.

Dkt. no. 235-4, p. 5. Thus, the parties extended the Letter of Intent for an additional 30 days. Id. at 6.

However, the parties were still unable to come to a written agreement. Judy and Darnall both admit they never signed a written Exclusive Supply Agreement. Darnall Dep. 189:20-25; Judy Dep. 35:5-7. According to Judy, "[w]e did our best to finalize [an agreement], but we could never get Gartner to cooperate with it." Judy 30(b)(6) Dep. 29:25-30:5. But while Candy Craft and its representatives admit that they never obtained a written agreement with Defendants, Candy Craft nevertheless maintains that it had reached an oral Exclusive Supply Agreement with

Gartner Studios. Darnall Dep. 189:20-25. When pressed at her deposition to identify who from Gartner Studios assented to this oral agreement, Darnall stated that "[a]ll I can say is that it was verbal, it was an understanding," and further suggested that the agreement was assented to by "Greg Gartner saying, trust us and we'll work together as partners." Id. 190:17-191:17. Judy, in her 30(b)(6) deposition, could not name several of the terms to this alleged oral agreement, including the agreed-upon price per unit of Fondarific, but she "assumed" that the duration would be "at least" four years. Judy 30(b)(6) Dep. 35:7-38:10.

One term of the alleged oral agreement that Judy was familiar with, though, was that Candy Craft would not circumvent Defendants' interest in the agreement by selling to "big box" stores. Judy 30(b)(6) Dep. 49:14-24. She further admits that Michaels, a chain of retail craft supply stores, was one of the "big box-like people." Id. at 49:25-50:3. Nevertheless, Judy, during the pendency of the alleged oral Exclusive Supply Agreement, had correspondence with Michaels that she characterizes as "relationship building." Id. at 49:25-51:6. Beginning on January 27, 2011, Judy had an email exchange with a Michaels representative in which she said "I sent you samples and just wanted to make sure you received them." Dkt. no. 235-1, pp. 18-20. Judy also asked how many SKUs (that is, discrete

products for sale) Michaels was interested in and when they would plan to set them in stores. Id. Judy also stated:

> [w]e would like to move forward and feel confident doing so . . . We want to verify that we will send direct to store via UPS . . . As soon as you know which 3 SKU's you would like please let us know so we can begin the translation process . . . I do not want any hard feelings with Gartner about this opportunity for our company. If you think it is appropriate I would like to be the one to initially let them know that we will be doing business together.

Id.[2]

While the parties were never able to come to a written Exclusive Supply Agreement, they nevertheless entered into open purchase orders with each other. On June 1, 2010, Jack Wardlaw, an agent and consultant for Candy Craft, emailed Jorge Allen of Gartner Studios, stating:

> Below please find our detailed proposal that reduces the cost of our product in a significant amount. Also notice that we are not requiring any contractual requirement but a blanket purchase order that allows Gartner to order in sufficient quantities to allow us to purchase raw materials at larger quantities. We believe this is a fair starting point that helps achieve both of our needs.

Dkt. no. 235-5, p. 2. Judy admitted that Gartner Studios purchased fondant from Candy Craft pursuant to a blanket $1 million open purchase order. Judy 30(b)(6) Dep. 44:6-15, 86:18-87:18. Ultimately, Defendants purchase about $2 million

---

[2] Defendants provide other evidence, such as emails and deposition admissions, suggesting that Candy Craft pursued other relationships with big-box stores or their distributors. The Michaels example alone, though, is enough for consideration of Defendants' motion for summary judgment. The Court need not chronicle the other examples.

worth of product from Candy Craft through various purchase orders. Id. at 79:6-10.

**Candy Craft Invests in a Larger Production Facility**

When Candy Craft began its negotiations with Gartner Studios, it was still producing Fondarific in small batches by hand. Dkt. no. 267-1, Ex. 16 ("Judy Aff."), ¶ 3. Also, the storage capacity at its initial production facility was limited. In order to meet the high production volume and low materials cost Candy Craft thought it must meet in order to satisfy the anticipated Exclusive Supply Agreement with Defendants, Candy Craft purchased and renovated a larger facility that could accommodate automation equipment and larger storage space in March, 2011. The automation would increase production, and the added storage space would allow Candy Craft to scale up its acquisition of raw materials in order to save on costs. The expenses for the acquisition and renovation of the new facility set Candy Craft back some $1.2 million, which Candy Craft financed in part with small-business loans. The facility was ready in June 2011. At Defendants' urging, Candy Craft spent time and money securing SQF (Safe Quality Food) certification and Kosher certification. However, only four months after entering the new facility that Candy Craft had acquired and renovated to meet the needs of its anticipated contract with Defendants, Defendants made their last purchase of fondant from

Candy Craft. Candy Craft was left with over $100,000 in raw materials, a newly renovated production facility, and food certifications it no longer needed for lack of an Exclusive Supply Agreement with a big-box distributor. See generally id.

**Tom Kwak Visits Candy Craft's Production Facility**

On March 18, 2010, while Candy Craft and Defendants were still pursuing a business relationship, Gartner Studios employee Tom Kwak traveled to Candy Craft's production facility. Kwak has a degree in food science, and visited Candy Craft's facility ostensibly to observe its production process and advise Candy Craft on ways to cut production costs. Dkt. no. 153-14 ("Kwak Dep.") 17:1-2, 21:5-11. Before entering the production room, Darnall told Kwak: "[E]verything was confidential and that Mr.—I said Gartner had signed a nondisclosure confidentiality [sic], and [Kwak's] exact word was 'Fine.'" Darnall 30(b)(6) Dep. 159:9-11.

While at the facility, Kwak observed workers making fondant, made a batch of fondant himself, and took notes. Darnall Dep. 165:9-19. Kwak was in the production room for 45 minutes to an hour, and made repeated requests to Candy Craft to provide him with the results of independent tests Candy Craft had conducted on Fondarific. Dkt. no. 45-4 ("Judy Aff. II"), ¶ 22. And the day after the visit, Kwak emailed Candy Craft to request proprietary information about the water content and

AO 72A
(Rev. 8/82)

spoilage characteristics of Fondarific. Dkt. no. 267-1 Ex. 19.
Darnall responded with emails from Candy Craft's food scientist
which contained proprietary product information and testing
results. Id. at Ex. 20.

One of the contested issues on summary judgment will be how
much of the production process Kwak saw on his visit. Darnall
testified that, at the time of the visit, certain dry
ingredients (gum powder and sugar) had been pre-mixed. Darnall
Dep. 181:9-21. Darnall further admits that Kwak did not see the
dry ingredients being mixed at any time during his visit.
Darnall 30(b)(6) Dep. 94:8-14. Kwak did observe, though, certain
wet ingredients being mixed. Id. at 97:10-98:5.

After Kwak's visit, no one from Candy Craft designated in
writing anything that Kwak saw in the production room during his
visit as "Confidential" within the ten day requirement of the
NDA. Judy 30(b)(6) Dep. 22:4-24. According to Judy, "[w]e just
didn't do it." Id.

**Gartner Studious Develops its Own Product**

On April 4, 2010, after Kwak had visited Candy Craft's
production facility, Gartner emailed his employee, Jorge Allen,
stating: "Jorge, I want you to speak with Kwak about their
operation then make an appointment to visit them asap. We just
gave them a [purchase order] for [$]500k, I want us to own
them." Dkt. no. 267-2, Ex. 21. Allen emailed Kwak the next day,

AO 72A
(Rev. 8/82)

stating: "Can you send me what you have on their operation, our plans, budgets, projections, etc." Id. Gartner began to notice that Fondarific was doing very well at the big-box stores, and he also took note of Judy's and Darnall's lack of business acumen:

> Since we are a large part of their sales, we should "own" them. Remember they are not trusting and new in business and will feel intimidated by trying to "deal" with them. They are a far superior product but you know their completion will change. . . . let them know we just sold 500 grocery stores last week (3 high end chains in CA) and are close to party City [sic] 550 stores.

Dkt. no. 267-2, Ex. 23. But before long, Defendants' discussions shifted from "owning" Candy Craft to producing the same fondant themselves. One step in this plan would be to:

> Sign a licensing agreement with Fondarific to utilize their recipe. This can be a one year agreement. This does a few things for us. Maintains consistency with the product that was launched and benefits we are selling to the retailer/consumer. Great taste and ease of use. Secondly, it keeps the ladies in our back pockets. The LAST thing we need is [cake decorating supplier] Wilton, or anyone else signing with them after we walk away. They know our volume and now know the great reception to their product at retail.

Id. Ex. 24.

By July 2010, Gartner Studios "decided to move forward with the development [of] [their] own fondant formula that matches the taste and functionality of the current Duff product." Id. Ex. 27. To "develop" a recipe that matched Fondarific, Gartner Studios hired Merlin Development to create a fondant that

matched Fondarific in taste and function. Id. Ex. 29. Merlin's

project manager for the Fondarific project confirmed that the

purpose of the business relationship with Merlin was to reverse

engineer Fondarific. She testified that Gartner Studios brought

her a container of Fondarific and said:

> We don't own the formula. This is our product, but we
> don't own the formula. So we want you to reverse
> engineer this so that we can make it commercially at
> somewhere else rather than where we are making it now,
> because they're gouging us on prices; we can't make
> any profit. We need to take this somewhere else, and
> we need to own the formula. So can you reverse
> engineer it?

Dkt. no. 153-7 (Notturno 30(b)(6) Dep.), 16:9-16. Notturno says

that it was clear that Gartner Studios wanted an exact match to

Fondarific, because she initially gave them what she considered

a superior product but Gartner Studios was not interested. Id.

at 30:5-8.

During the development, Merlin needed to know various

details about Fondarific in order to reverse engineer it. For

instance, Merlin needed to know whether the glycerin in the

fondant was derived from plant or animal sources. Dkt. no. 267-

2, Ex. 32. Thus, a Gartner Studios employee emailed Darnall and

Judy asking: "I have a vegan asking if the glycerin in your

fondant is derived from a plant or animal source. Please let me

know." Id. Ex. 33. Furthermore, Kwak was involved with Merlin in

sharing what he knew about Fondarific. He was specifically

called on to meet with Merlin employees to discuss Fondarific. Id. at Exs. 35-36. Also, when a specific question about what type and process for utilizing white-chocolate compound base Candy Craft was using in Fondarific, Kwak responded "They are using chips and heating them in the microwave. It is actually white chocolate compound." Id. Ex. 1. Furthermore, Kwak even acknowledged in an internal email to Defendants that Gartner Studio had "knocked off" Fondarific. Id. Ex. 2.

On October 12, 2010, Merlin finalized the fondant formula. The next day, Gartner Studios executed $1 million purchase order of Fondarific "to protect [their] supply of product while [they] decide [their] course of action." Id. Exs. 38-40. The Gartner Studios employee sending the email to Judy and Darnall executing the $1 million purchase order signed off by stating: "I look forward to a long relationship between our companies." Id.

In December, 2011, Gartner Studios and Gartner incorporated Tylina Food Products Corporation. In April 2012, Tylina began discussions with "major Grocery Chains, Target Grocery, and Walmart grocery." Id. Ex. 42. Shortly thereafter, Gartner Studios terminated its relationship with Candy Craft and began selling the "reverse engineered" fondant, which it called "Fontastic," to Target, Michaels, Wal-Mart, Bulk Barn, and other large buyers in lieu of selling Fondarific manufactured by Candy Craft. Judy Aff. II ¶ 31.

AO 72A
(Rev. 8/82)

# DISCUSSION

## I. Defendants' Objection to the Magistrate Judge's Order Admitting the Opinion of Joseph F. Hair

When a magistrate judge rules on a non-dispositive pretrial discovery matter, parties may object to that ruling and seek review from the district judge under Federal Rule of Civil Procedure 72(a). See Fed. R. Civ. P. 72(a). In reviewing the magistrate judge's order, the district judge must "modify or set aside any part of the order that is clearly erroneous or is contrary to law." Id. The clearly erroneous or contrary to law standard "is exceedingly deferential." Jackson v. Deen, CV 412-139, 2013 WL 3991793, at *2 (S.D. Ga. Aug. 2, 2013) (citing Pigott v. Sanibel Dev., LLC, CV 07-0083-WS-C, 2008 WL 2937804, at *5 (S.D. Ala. July 23, 2008)). "A ruling is clearly erroneous where either the magistrate judge abused his discretion or the district court, after reviewing the entirety of the record, is left with a definite and firm conviction that a mistake has been made." Id. (citations omitted). "A decision by the magistrate judge is contrary to law where it either fails to follow or misapplies the applicable law." Id. (citations omitted).

Joseph F. Hair is a marketing professor Plaintiffs retained to offer expert testimony regarding Fondarific's past and future performance in the cake decorating market. One of the opinions outlined in his expert report, Opinion 10, gives a brief history

of cake decorating and states that, because of this history, "a reasonable future time frame for the life of the rolled fondant product category is at least the next 50 years, and likely much longer." Dkt. 263-3, p. 46 (quoting Opinion 10). Defendants challenged this opinion in a motion *in limine*, arguing that it lacked a proper foundation. Dkt. no. 239, pp. 19-22. Plaintiff responded by producing a new affidavit from Hair discussing in more detail the sources and methods he relied upon in reaching the 50 year projection. See Dkt. no. 263, pp. 28-31.

The Magistrate Judge, in deeming Opinion 10 admissible, relied on this new affidavit in concluding that Hair set forth a proper foundation for his opinion. Dkt. no. 322, p. 13. Defendants argue that Hair's new affidavit amounts to an improper supplement that the Magistrate Judge should have disregarded because it is the result of "inadequate or incomplete" preparation by the expert. See Sommers v. Hall, 2010 WL 3463608, at *2 (S.D. Ga. Sept. 1, 2010).

The subsequent affidavit did not provide any additional substance to Opinion 10; it merely explained the foundation of Opinion 10 in greater detail. While the necessity for Hair's subsequent affidavit does not exemplify the assiduous preparation this Court expects of its litigants and their experts, it was not clearly erroneous or contrary to law for the Magistrate Judge to consider an expert's subsequent affidavit

explaining a prior opinion more thoroughly. Defendants' Rule
72(a) Objection (Dkt. no. 330) to the Magistrate Judge's August
27, 2014 Order (Dkt. no. 322) is **OVERRULED**.

## II. Defendants' Motion to Strike Plaintiff's Errata Sheets

Defendants have filed a Motion to Strike the errata sheets
of Candy Craft's Rule 30(b)(6) representatives, Judy and
Darnall. Dkt. no. 258. Defendants argue that the errata sheets,
which were filed after Defendants filed their Motion for Summary
Judgment (Dkt. no. 235), substantively changed and contradicted
Darnall's and Judy's prior 30(b)(6) testimonies in an attempt to
fabricate factual disputes. Defendants also seek sanctions for
the costs of filing the motion.

Defendants took the original 30(b)(6) depositions on
February 14, 2014. Defense counsel asked Judy questions about
whether the trade secret or other intellectual property was ever
assigned to Candy Craft in writing, whether the value of the
trade secrets is reflected on Candy Craft's balance sheet, and
what specific steps she took to vet Greg Gartner and Gartner
studios. See Dkt. no. 258-1, Ex. C, p. 32 (chart comparing
Judy's 30(b)(6) testimony to her later errata alterations). Judy
initially responded that she did not "really know what
[Defendants' counsel was] getting at" in regards to the
questions about assignment, and later stated that she "could not
recall right now" whether the trade secret was assigned in

writing. Id. She also stated that she "cannot remember" what steps she took to vet Greg Gartner, and that she did not know whether the value of the trade secret was reflected on the balance sheet. Id. However, after Defendants filed their motion for summary judgment (which relied heavily on these assertions), Plaintiff's counsel filed an errata sheet for Judy's 30(b)(6) testimony stating that the trade secret was assigned to Candy Craft in a March 14, 2010 patent application, that she asked a friend (since deceased) to do a background check on Greg Gartner, and that the value of the trade secret is reflected on Candy Craft's balance sheet as $31,000 Goodwill listed under other assets. Id.

Similarly, Darnall originally testified in her 30(b)(6) deposition that she and Judy owned the trade secret, that Candy Claydough was the "genesis" of Fondarific, that there was a verbal rather than written assignment of the trade secret, and that Darnall personally developed Fondarific's trade secrets. Id. at Ex. F, p. 45 (chart comparing Darnall's 30(b)(6) testimony to her later errata alterations). In her errata sheet, though, Darnall changes these answers to state that Candy Craft, which itself is owned by Judy and Darnall, owned the trade secret; Candy Claydough was not the genesis of Fondarific; the trade secret was assigned in writing by the patent application;

AO 72A
(Rev. 8/82)

and that Judy and Darnall created the Fondarific recipe together as owners of Candy Craft. Id.

Federal Rule of Civil Procedure 30(e)(1) allows deponents to review the deposition and make changes "in form or substance" within 30 days of the deposition. Fed. R. Civ. P. 30(e)(1). Plaintiff points out that federal courts have taken two approaches to errata changes, one strict and the other lenient:

> The first line of cases holds that, absent some obvious confusion during a deposition or an error in transcription, deponents cannot make substantive changes to their deposition testimony through the use of an errata sheet. . . . Other courts are more lenient in allowing a deponent to change his or her testimony using an errata sheet.

ChemFree Corp. v. J. Walter, Inc., No. CIV. 1:04-CV-3711, 2008 WL 5234247, at *1 (N.D. Ga. Sept. 30, 2008). The Eleventh Circuit has not held which standard applies in this Circuit, but has affirmed a district court who applied the more stringent test. See id. at *2 (citing Reynolds v. I.B.M. Corp., 125 F. App'x 982 (11th Cir. 2004), aff'g 320 F. Supp. 2d 1290, 1301 (M.D. Fla. 2004)). The ChemFree court went on to note that "Although courts are split on when it is appropriate to allow deponents to substantively change their deposition testimony, many courts agree that substantive changes to deposition testimony are particularly suspect when they are offered in response to a motion for summary judgment." Id. This District

AO 72A
(Rev. 8/82)

has previously reserved the question of whether errata

alterations are appropriate after a motion for summary judgment:

> The Court reserves the question of whether these errata alterations may be relied upon to create a material factual dispute at the summary judgment stage of litigation. While plaintiff is free to make substantive errata changes that contradict her prior deposition testimony, the Court is not necessarily precluded from disregarding such changes in deciding a motion for summary judgment.

Purdee v. Pilot Travel Cntrs., LLC, No. CV 407-028, 2007 WL

3142716, at *2, n.2 (S.D. Ga. October 23, 2007).

The Third Circuit Court of Appeals also offers a helpful

perspective:

> [A] district court does not abuse its discretion under Rule 30(e) when it refuses to consider proposed substantive changes that materially contradict prior deposition testimony, if the party proffering the changes fails to provide sufficient justification. At the same time, we emphasize that courts may, in their discretion, choose to allow contradictory changes (and implement the remedial measures discussed above) as the circumstances may warrant.

EBC, Inc. v. Clark Bldg. Sys., Inc., 618 F.3d 253, 268 (3d Cir.

2010). Here, Plaintiffs generally listed the reason for the

alteration in their errata sheets as "to correct the record,"

without elaboration. Dkt. no. 258-1, Ex. A, p. 24 & Ex. B,

p. 30. In its brief in opposition to Defendants' motion,

Plaintiff focuses heavily on Judy's apparent confusion during

the deposition as the reason for the alterations. Dkt. no. 276,

pp. 1-4. Given how closely tailored the errata alterations are

AO 72A
(Rev. 8/82)

to the issues presented in Defendants' motion for summary judgment and the fact that Plaintiff offers scant justification for the alterations in the errata sheets, this Court will not strike the errata sheets from the record, but neither will it allow the errata sheets to create a material issue of fact in the summary judgment analysis.

Defendants' Motion to Strike the Errata Sheets, then, is **DENIED**, with the condition that the Court will disregard those alterations in deciding the motion for summary judgment. Because the law in the Eleventh Circuit is not particularly clear on the appropriateness of errata changes, this Court finds that Plaintiff's attempt to file the errata sheets was not unreasonable, and thus Defendants' request for sanctions regarding the filing of this motion is **DENIED**.

## III. Defendants' Motion to Strike the Affidavit of Stewart Bromley

Defendants first challenged Plaintiff's standing to bring this lawsuit in its Motion for Summary Judgment, arguing that Plaintiffs had failed to prove that Candy Craft (as opposed to Judy or Darnall) owned the trade secret behind Fondarific. Plaintiffs responded a few weeks later by providing a declaration from Stewart Bromley, Candy Craft's accountant, in which Bromley makes various statements about how Candy Craft accounted for the research and development of Fondarific in its

AO 72A
(Rev. 8/82)

tax filings, which in turn explained why Candy Craft had not listed Fondarific as a trade secret on its balance sheet. See Dkt. no. 254-3 (Bromley Decl.) ¶¶ 4-6. Defendants argue that this opinion amounts to an expert opinion. Because Bromley was only disclosed as a lay witness, Defendants argue that he does not meet Federal Rule of Civil Procedure 26's requirements for expert witnesses, and his declaration is thus an expert report "masquerading" as an affidavit and therefore must be stricken. Dkt. no. 288 (Mot. to Strike Bromley Decl.) p. 2.

Generally, a party seeking to submit expert testimony under Federal Rule of Evidence 702 "must make [expert] disclosures at the times and in the sequence that the court orders." Fed. R. Civ. P. 26(a)(2)(D). However, Federal Rule of Evidence 701 does not prohibit lay witnesses from testifying based on particularized knowledge gained from their own personal experiences. A lay witness may testify regarding "particularized knowledge" that he has "by virtue of his or her position" in a particular business. Tampa Bay Shipbuilding & Repair Co. v. Ceder Shipping Co., Ltd., 320 F.3d 1213, 1222 (11th Cir. 2003). A common example of when someone who could potentially qualify as an "expert" nevertheless testifies as a lay witness under Rule 701 is the "treating physician" standard: "A physician may offer lay opinion testimony, consistent with Rule 701, when the opinion is based on his experience as a physician and is clearly

helpful to an understanding of his decision making process in the situation." Williams v. Mast Biosurgery USA, Inc., 644 F.3d 1312, 1317 (11th Cir. 2011).

Here, Bromley testified that Candy Craft deducted its research and experimental expenses since its inception in reliance upon his interpretation and application of I.R.C. § 174. Bromley Decl. ¶ 5. The affidavit explains how Bromley prepared Candy Craft's balance sheet, id., and that Candy Craft has been taxed as a partnership since its inception, id. ¶ 6. Plaintiff did not offer Bromley's testimony as a hypothetical assessment of the validity of Plaintiff's filings. Rather, Bromley depicts and explains his own personal decision making process as he prepared the financial documents discussed in the declaration. While he may be qualified to testify as an expert, here he is testifying as a lay witness because his opinions are based on his own personal experiences.

Plaintiff first disclosed Bromley as a witness in its November 7, 2012 interrogatory responses, 15 months prior to the close of discovery. Dkt. no. 294, p. 14. While it was not disclosed that Bromley would testify particularly as to Plaintiff's standing, that issue was not raised until Defendants filed their Motion for Summary Judgment. Defendants could have inquired into the extent of his knowledge regarding the trade secrets and the balance sheet during discovery, but chose not

AO 72A
(Rev. 8/82)

to. The Eleventh Circuit has held that district courts act within their discretion in denying motions to strike declarations in support of or in response to a motion for summary judgment if the witness was previously disclosed and the other party could have inquired into the extent of the witness knowledge regarding certain claims. See Barron v. Fed. Reserve Bank of Atlanta, 129 F. App'x 512, 519 (11th Cir. 2005). Defendants' Motion to Strike Bromley's Declaration (Dkt. no. 287) is **DENIED.**

## IV.  Defendants' Motion for Judgment on the Pleadings

Before considering Defendants' Motion for Summary Judgment, the Court will first address Defendants' Motion for Judgment on the Pleadings (Dkt. no. 234) which seeks to dispose of some, but not all, of the claims addressed in the Motion for Summary Judgment. Defendants' Motion for Judgment on the Pleadings targets nine of the fourteen counts in Plaintiff's complaint. At the December 5, 2014 motions hearing, Plaintiffs conceded several of these causes of action, including the claims for violations of the Lanham Act and Uniform Deceptive Trade Practices act (Count IV), breach of implied covenant of good faith and fair dealing (Count VI), tortious interference with business relations and contractual relations (Count X), and civil conspiracy (Count XI). Thus, the five remaining counts discussed in Defendants' motion for judgment on the pleadings

include fraud (Count II), breach of fiduciary duty (Count V), unjust enrichment (Count VII), promissory estoppel (Count VIII), and punitive damages (Count XIII).

Plaintiff asks that the Court deny the motion for judgment on the pleadings outright for procedural reasons. The Court considered the Defendants' first motion for judgment on the pleadings (Dkt. no. 113) at the July 17, 2013 motions hearing (Transcript at Dkt. no. 164). The arguments in that motion and the arguments made at the hearing are the same as those presented in the present motion. After hearing the arguments, the Court denied Defendants' motion at that time, but stated that Defendants may raise these same arguments again in a motion for summary judgment, "[b]ut as far as dispensing with those claims on a Motion for Judgment on the Pleadings, I will deny that motion." Dkt. no. 164-1, p. 84.

Defendants argue that they understood the Court's bench ruling to mean they could recast their arguments in a motion for summary judgment *if* discovery produced evidence that could support Plaintiff's deficient claims, but that absent such evidence it was free to re-file its motion for judgment on the pleadings after discovery. Plaintiff counters that if it had understood the Court's ruling to permit a second motion for judgment on the pleadings, it would have amended its complaint. To reconsider the motion for judgment on the pleadings now,

AO 72A
(Rev. 8/82)

Plaintiff argues, would unduly prejudice Plaintiff. Despite this procedural confusion, the Court will nevertheless rule on the merits of Defendants' motion because it is due to be denied, and thus will not prejudice Plaintiff.

### a. Standard of Review

"After the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). "Judgment on the pleadings is appropriate when there are no material facts in dispute, and judgment may be rendered by considering the substance of the pleadings and any judicially noticed facts." Hawthorne v. Mac Adjustment, Inc., 140 F.3d 1367, 1370 (11th Cir. 1998) (citing Bankers Ins. Co. v. Fla. Residential Prop. & Cas. Joint Underwriting Ass'n, 137 F.3d 1293, 1295 (11th Cir. 1998)). The court accepts the facts in the complaint as true and views them in the light most favorable to the nonmoving party. Id. (citing Ortega v. Christian, 85 F.3d 1521, 1524 (11th Cir. 1996)). "The complaint may not be dismissed 'unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" Id. (quoting Slagle v. ITT Hartford, 102 F.3d 494, 497 (11th Cir. 1996)). Exhibits attached to pleadings become part of the pleadings for all purposes, Fed. R. Civ. P. 10(c), and this Court may thus consider the exhibits attached to Candy Craft's First Amended Complaint without

converting Defendants' motion into a motion for summary judgment.

**b. Preemption of the State Law Claims**

As mentioned above, only five counts remain for consideration in Defendants motion for judgment on the pleadings: four are tort and restitutionary claims related to Defendants' alleged misappropriation of Plaintiff's fondant recipe (fraud, breach of fiduciary duty, unjust enrichment, and promissory estoppel). The fifth, punitive damages, stands or falls with the fraud claim at the motion for judgment on the pleadings stage.

Because these state law claims are related to Plaintiff's misappropriation claims, Defendants argue that each of these counts is preempted by the Georgia Trade Secrets Act. The GTSA supersedes "conflicting tort, restitutionary, and other laws of this state providing civil remedies for misappropriation of a trade secret," but does not affect "contractual duties or remedies, whether or not based upon misappropriation of a trade secret. . ." and "other civil remedies that are not based upon misappropriation of a trade secret." Ga. Code Ann. § 10-1-767(a), (b)(1), (b)(2). Plaintiff counters that, while each of these counts may include allegations related to the misappropriation claim, each count also includes allegations unrelated to the misappropriation.

31

Thus, the decisive issue on Defendants' motion for judgment on the pleadings is whether the GTSA preempts non-GTSA state law claims that rely on allegations of misappropriation to any degree, or if it rather preempts only those non-GTSA state law claims that rely *solely* on allegations of misappropriation and do not include non-misappropriation allegations.

Georgia case law does not precisely define what quantum of non-misappropriation allegations will save a non-GTSA claim from preemption. The Georgia Court of Appeals has held that a trial court erroneously dismissed a plaintiff's non-GTSA claims where it "erroneously concluded that each of [the plaintiff's] non-GTSA claims were based *solely* on the misappropriation of proprietary information, and it therefore erred in holding that the claims were preempted by the GTSA." Prof. Energy Mgmt., Inc. v. Necaise, 684 S.E.2d 374, 377-78 (Ga. Ct. App. 2009) (emphasis added). The court in Necaise went on to inspect each of the plaintiff's non-GTSA claims for allegations of conduct beyond the scope of the GTSA, and held that the trial court erred in dismissing those claims that allege conduct not covered by the GTSA. Id. at 378-81.

Defendants urge this Court to give more consideration to a subsequent Georgia Supreme Court case. In Robbins v. Supermarket Equipment Sales, LLC, 722 S.E.2d 55 (Ga. 2012), the Georgia Supreme Court reversed a trial court that had granted the

AO 72A
(Rev. 8/82)

plaintiff "the same relief based on the same allegations it would have received" for misappropriation of trade secrets under the GTSA. Robbins, 722 S.E.2d at 58. The court also noted that "the key inquiry is whether the same factual allegations of misappropriation are being used to obtain relief outside the GTSA." Id.

Robbins relied, in part, on Necaise's holding. Id. If the Georgia Supreme Court thought that Necaise's holding that the GTSA only preempts non-GTSA claims that rely "solely" on allegations of misappropriation went too far in limiting GTSA's preemption power, it could have said so. Furthermore, other federal courts demarcating the GTSA's preemption powers have also interpreted that power to extend only to non-GTSA claims based on facts that would exclusively support a GTSA claim. See, e.g., Penalty Kick Mgmt. Ltd. v. Coca Cola Co., 318 F.3d 1284, 1298 (11th Cir. 2003) (preempting claims where "the full extent of each [claim was] based upon a trade secret.") (emphasis in original); Diamond Power Int'l, Inc. v. Davidson, 540 F. Supp. 2d 1322, 1345 (N.D. Ga. 2007) ("Preemption is only appropriate where other claims are no more than a restatement of the same operative facts which would plainly and exclusively spell out only trade secret misappropriation.") (emphasis added).

Each of Plaintiff's claims for fraud, breach of fiduciary duty, unjust enrichment, and promissory estoppel plead operative

facts that go beyond those "facts that would plainly and
exclusively spell out only trade secret misappropriation." <u>See</u>
<u>Diamond Power</u>, 540 F. Supp. 2d at 1345. Count II for fraud
alleges that Defendants made misrepresentations of material fact
not only to misappropriate the fondant recipe, but also to
"steal Plaintiff's customers or business opportunities." Compl.
¶ 96. Count V for breach of fiduciary duty alleged that
Defendants had a fiduciary duty to Plaintiff by virtue of the
NDA, confidentiality agreement, "and/or" common law that
prevented Defendants from using Plaintiff's trade secrets "and
further prevented Defendants from soliciting and co-opting
Plaintiff's customers/clients for a rival business . . ."
<u>Id.</u> ¶ 118. <u>Cf.</u> <u>Necaise</u>, 684 S.E.2d at 378 ("The alleged
solicitation of [plaintiff's] customers for a rival business is
conduct outside the scope of the GTSA, and it supports
[plaintiff's] claim for breach of fiduciary duty against
[defendant]."). Count VII for unjust enrichment alleges that
Defendants were unjustly enriched by obtaining not only
Plaintiff's proprietary fondant recipe, but also "the identity
of Plaintiff's customers or potential customers." Compl. ¶¶ 127-
128. <u>Cf.</u> <u>Necaise</u>, 684 S.E.2d at 379 (claim for unjust enrichment
not preempted where plaintiff alleged enrichment "not merely by
the value of the proprietary information they allegedly
misappropriated" but also by soliciting plaintiff's customers).

AO 72A
(Rev. 8/82)

Finally, Count VIII for promissory estoppel alleges that Defendants made certain promises to induce Plaintiff to provide its proprietary recipe and also "to allow Defendants to solicit and co-opt Plaintiff's customers and potential customers." Compl. ¶ 132.

Clearly, each of these claims is based on allegations separate and distinct from the allegations of trade secret misappropriation claims and therefore is not preempted by the GTSA. Because Plaintiff's claims for fraud and breach of fiduciary duty are not preempted, Plaintiff's claim for punitive damages is not subject to dismissal. Thus, Defendants' Motion for Judgment on the Pleadings (Dkt. no. 234) is **DENIED** as to Counts II, V, VII, VIII, and XIII, and **GRANTED** (by concession) as to Counts IV, VI, X, and XI.

## V.    Defendants' Motion for Summary Judgment

In their motion for summary judgment (Dkt. no. 235-1), Defendants argue that they are entitled to summary judgment on Candy Craft's claims of breach of contract (Count III), misappropriation of trade secrets (Counts I, VII), and trade dress infringement (Count IV). Defendants also include in their motion for summary judgment Candy Craft's fraud claim (Count II), as an alternative to their challenge of that claim in their motion for judgment on the pleadings. Additionally, Defendants argue that they are entitled to summary judgment on all of

Plaintiff's claims because Plaintiff allegedly has not established that it owned the trade secrets in question, and thus does not have standing to bring these claims. Finally, Defendants argue that Plaintiff failed to established any damages for the claims.

Candy Craft's trade dress claim was dismissed on the motion for judgment on the pleadings. The remainder of the summary judgment claims are discussed below.

### a. Legal Standard

Summary judgment is required where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law." FindWhat Investor Grp. v. FindWhat.com, 658 F.3d 1282, 1307 (11th Cir. 2011) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). A dispute over such a fact is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. In making this determination, the court is to view all of the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. Johnson v. Booker T. Washington Broad. Serv., Inc., 234 F.3d 501, 507 (11th Cir. 2000). However, where the nonmovant's own sworn testimony contradicts the more favorable testimony of

AO 72A
(Rev. 8/82)

another witness, the court must accept the nonmovant's version of the events. Evans v. Stephens, 407 F.3d 1272, 1278 (11th Cir. 2005).

The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). To satisfy this burden, the movant must show the court that there is an absence of evidence to support the nonmoving party's case. Id. at 325. If the moving party discharges this burden, the burden shifts to the nonmovant to go beyond the pleadings and present affirmative evidence to show that a genuine issue of fact does exist. Anderson, 477 U.S. at 257.

### b. Standing as to the GTSA Claims

As an initial matter, Defendants argue that Candy Craft does not have standing to bring suit for the alleged misappropriation of trade secrets it does not own. Plaintiff, in response, argues first that ownership of a trade secret is not required to confer standing under the GTSA, and, second, that whether or not Candy Craft owns the trade secret is an issue of fact.

The GTSA defines "misappropriation" as "acquisition of a trade secret *of another* by a person who knows or has reason to know that the trade secret was acquired by improper means." Ga. Code Ann. § 10-1-761(2)(A) (emphasis added). Plaintiff argues

that rightful possession of the trade secret alone is enough to confer standing on a party to sue for misappropriation, as the plain language of the statute says nothing about ownership. By way of comparison, Georgia's criminal statute for theft of a trade secret (as opposed to the civil proscription and cause of action for misappropriation) explicitly makes theft of a trade secret "from the owner thereof" an element of the crime. Ga. Code Ann. § 16-8-13(b). Thus, the Georgia legislature appears to know how to make ownership an element of its trade secrets laws when it wants to do so.

Similarly, the Eleventh Circuit has stated that a "claim for misappropriation of trade secrets under the Georgia Trade Secrets Act requires a plaintiff to prove that '(1) it had a trade secret and (2) the opposing party misappropriated the trade secret.'" Capital Asset Research Corp. v. Finnegan, 160 F.3d 683, 685 (11th Cir. 1998) (quoting Camp Creek Hospitality Inns, Inc. v. Sheraton Franchise Corp., 136 F.3d 1396, 1410 (11th Cir. 1998)). This formulation makes no mention of ownership.

Apart from the omission of "ownership" from either the GTSA itself or the Eleventh Circuit opinions interpreting it, both parties agree that whether ownership is a necessary element for standing to bring a GTSA claim is an open question in Georgia. Plaintiff would have this court examine other state's courts'

AO 72A
(Rev. 8/82)

interpretations of different (but largely similar) trade secret acts based on the Uniform Trade Secrets Act. See, e.g., Metso Minerals Inds. v. FLSmidth-Excel LLC, 733 F. Supp. 2d 969, 972 (E.D. Wis. 2010) (interpreting the language "[a]cquiring the trade secret of another" in Wisconsin's trade secrets act to only require rightful possession, as opposed to ownership). Defendants, though, argue that the Georgia Supreme Court has defined trade secrets as "the property of the employer" in other contexts, and that trade secrets generally must therefore be subject to ownership. See Avnet, Inc. v. Wyle Labs., Inc., 437 S.E.2d 302, 304 (Ga. 1993) (holding that an employer's list of customers was a trade secret, and trade secrets "are the property of the employer and cannot be taken or used by the employee for his own benefit."). Defendants urge this Court to infer that the Georgia Supreme Court would likewise require ownership of a trade secret, as opposed to possession, for a party to have standing to bring a misappropriation claim.

Defendants' suggestion that ownership is necessary for standing to bring a GTSA claim goes beyond the plain meaning of the statute and the Eleventh Circuit's and Georgia Courts' holdings. Furthermore, the notable differences between misappropriation of trade secrets and theft of trade secrets in the Georgia Code strongly suggests that the Georgia legislature did not intend ownership to be an element of a claim for

misappropriation of trade secrets. This Court will not read the GTSA more restrictively than have Georgia's own Courts. In this case, Candy Craft's questionable ownership of the recipe for Fondarific does not prevent it from having standing to sue Defendants for misappropriation of that trade secret.

### c. Breach of Contract

Plaintiff's Complaint brings two theories for breach of contract: first, Plaintiff alleges that Defendants breached the allegedly oral Exclusive Supply Agreement by producing its own fondant instead of purchasing Fondarific from Candy Craft; second, Plaintiff alleges that Gartner Studios breached the NDA by using its knowledge of Plaintiff's production process and distribution channels to develop a competing product.

### i. Breach of the Alleged Exclusive Supply Agreement

The key question in Plaintiff's claim that Defendants breached the Exclusive Supply Agreement is whether there was ever an Exclusive Supply Agreement to begin with. While the parties signed a Letter of Intent, it is undisputed that the parties never achieved a written Exclusive Supply Agreement. Furthermore, it is undisputed that Candy Craft supplied Gartner Studios with fondant under multiple open purchase order agreements which explicitly did not contractually bind Defendants. Nevertheless, Plaintiff claims that the parties had

an oral Exclusive Supply Agreement, and that its part performance of that agreement makes it binding on Defendants.

In Georgia, a valid contract requires "parties able to contract, a consideration moving to the contract, the assent of the parties to the terms of the contract, and a subject matter upon which the contract can operate." Ga. Code Ann. § 13-3-1. "A meeting of the minds is the first requirement of law relative to contracts. . . . If there is any essential term upon which agreement is lacking, no meeting of the minds of the parties exists, and a valid and binding contract has not been formed." Auto-Owners Ins. Co. v. Crawford, 525 S.E.2d 118, 120 (Ga. Ct. App. 1999). See also Contract Furniture Refinishing & Maint. Corp. of Ga. v. Remanufacturing & Design Grp., LLC, 730 S.E.2d 708, 710 (Ga. Ct. App. 2012) ("A contract cannot be enforced if its terms are incomplete, vague, indefinite or uncertain.").

Additionally, contracts in which performance exceeds one year must be in writing unless an exception applies. Ga. Code Ann. § 13-5-30(5). The contract does not have to be in writing if: (1) the alleged contract has been fully executed; (2) there has been performance on one side that was accepted by the other party; or (3) "there has been such part performance of the contract as would render it a fraud of the party refusing to comply if the court did not compel a performance." Ga. Code Ann. § 13-5-31.

AO 72A
(Rev. 8/82)

Here, even though Plaintiff repeatedly claims that the existence of an oral Exclusive Supply Agreement is a question of fact for the jury, there are no facts in the evidence from which a jury could conclude that such an agreement existed. The Letter of Intent the parties signed required the parties to reach "*definitive* agreements" for there to be an Exclusive Supply Agreement. And here, there is nothing definitive about the alleged oral agreement. All that Darnall could point to as evidence of Defendants' assent to the Exclusive Supply Agreement is Gartner's vague statement, "trust us and we'll work together as partners." Darnall Dep. 190:17-191:17. The aspiration to "work together as partners" is not an assent to an Exclusive Supply Agreement, especially when Defendants and Candy Craft *did* work together as partners—with open purchase orders, but not an Exclusive Supply Agreement. Additionally, Judy, as Candy Craft's 30(b)(6) representative, could not name a single term of the alleged oral agreement, except to say that she "assumed" that the duration would be "at least" four years. Judy 30(b)(6) Dep. 35:7-38:10. An assumption about the duration of the contract makes that term "indefinite and uncertain," and thus unenforceable.

It is undisputed that the parties never reached a written Exclusive Supply Agreement, even though the Letter of Intent shows that the parties entered negotiations. Aside from

Plaintiff's desire for an oral agreement, it has produced no evidence that the parties ever actually reached any agreements besides the open purchase orders that the parties contracted for in lieu of an Exclusive Supply Agreement. Thus, Plaintiff's theory that Defendants breached an Exclusive Supply Agreement cannot go forward.

### ii. Breach of the NDA

Alternatively, Plaintiff argues that Defendants breached the non-disclosure agreement (NDA) when Kwak, one of Gartner's employees, visited the Candy Craft factory, made Fondarific with the Judy and Darnall, and then used that information to work with Merlin to reverse-engineer the fondant. Despite a requirement in the NDA that all written confidential materials be labeled "confidential" and all verbal communications be reduced to writing and labeled as "confidential" within 10 days of the disclosure, Dkt. no. 235-3, p. 33, Plaintiff argues that Defendants, through Kwak, waived the writing requirement after he was told that "everything" he was about to see was confidential and he responded "fine." The parties contest whether this exchange amounts to a waiver of the writing requirement in the NDA.

Georgia courts allow parties to waive or modify contract provisions in certain circumstances. "A waiver may be express, or may be inferred from actions, conduct, or a course of

AO 72A
(Rev. 8/82)

dealing." Ansley v. Ansley, 705 S.E.2d 289, 294 (Ga. Ct. App. 2010). "Courts will readily seize upon any fact or circumstances growing out of the conduct of the parties, tending to show a waiver of strict compliance, and will seek to avoid the forfeiture and to leave the actual merits of the case open to investigation." Stimson v. George Laycock, Inc., 542 S.E.2d 121, 125 (Ga. Ct. App. 2000). However, "the law will not infer the waiver of an important contract right unless the waiver is clear and unmistakable." Vratsinas Const. Co. v. Triad Drywall, LLC, 739 S.E.2d 493, 496 (Ga. Ct. App. 2013).

Defendants argue that an oral waiver is not effective when the clear terms of an NDA require disclosed secrets to later be identified in writing as confidential, and cites a case from the Federal Circuit for this proposition. In Convolve , Inc. v. Compaq Computer Corp., the Federal Circuit held that an NDA requiring verbal disclosures to later be identified in writing is not waived or modified where the only evidence of the waiver is one employee's subjective belief that all disclosures were confidential. 527 F. App'x 910, 923-24 (Fed. Cir. 2013). "[T]he subjective intent of one of the parties is not indicative of the mutual intent of both parties." Id. at 924. Defendants also rely on Big Vision Private Ltd. v. E.I. DuPont De Nemours & Co., which adopted Convolve's holding in rejecting a plaintiff's

modification argument. 1 F. Supp. 3d 224, 255-56 (S.D.N.Y. 2014).

Convolve and Big Vision are easily distinguishable from the present case. In Convolve, the only evidence presented of the alleged waiver was one party's subjective belief that all disclosures were protected by the nondisclosure agreement. Here, though, Plaintiff explicitly told Kwak that what he was about to see was covered by the confidentiality agreement, and he responded by saying "fine." While his assent is not entirely explicit, it is enough to indicate "the mutual intent of both parties" that what Kwak would see during his visit to Candy Craft's production facility would be protected by the confidentiality agreement. And in Big Vision, the court did not even consider the merits of the plaintiff's modification argument because the NDA in that case "quite clearly prohibit[ed] oral modification except upon written agreement by both parties." 1 F. Supp. 3d at 255. The NDA between Candy Craft and Gartner Studios has no such prohibition.

Alternatively, Defendants argue that Kwak's waiver is not effective because he either did not have the actual authority to assent to a waiver or because he did not know that by saying "fine" he was waiving Gartner Studio's right under the NDA to receive subsequent written notification of which disclosures were confidential.

Defendants correctly note that Georgia courts require some evidence that the waiving agent had actual or apparent authority to relinquish the contractual right. In support of this requirement, Defendants cite a dissenting opinion from the Georgia Court of Appeals:

> Where the only evidence that a person is an agent of another party is the mere assumption that such agency existed, or an inference drawn from the actions of that person that he or she was an agent of another party, such evidence has no probative value and is insufficient to authorize a finding that such agency exists.

Capital Color Printing, Inc. v. Ahern, 661 S.E.2d 578, 589 (Ga. Ct. App. 2008) (Smith, P.J., concurring in part and dissenting in part). The majority's holding in Capital Color was that "the conduct giving rise to apparent agency may be proved, as any other fact, by circumstantial evidence including proof of circumstances, apparent relations, and the conduct of the parties." Id. at 585. Here, Plaintiff's contention that Kwak had the authority to waive the NDA's writing requirement is not based on a "mere" assumption, but instead on the fact that Kwak was Gartner Studio's employee. There is at least a question of material fact as to whether or not Kwak had the authority to waive the NDA's writing requirement.

Defendants' argument that Kwak did not know he was waiving the NDA's writing requirement also fall short. Kwak had specific knowledge of the NDA when he visited the Candy Craft facility,

AO 72A
(Rev. 8/82)

as evinced by Darnall's statement that everything he was about to see was confidential. Furthermore, his position of Vice President of Operations at Gartner Studios, his involvement with Merlin in reverse-engineering Fondarific, and Gartner Studios' surreptitious efforts to extract more details about Fondarific to supply to Merlin all create circumstances from which a jury could infer that he knew of the NDA and what it entailed.

There is enough evidence in the record to present a jury with the question of whether Kwak waived the NDA's writing requirement. Thus, whether Gartner Studios' efforts to capitalize on the secrets Kwak observed during his visit to Candy Craft's facility violate the NDA also turns, in part, on a question of material fact. Defendants' motion for summary judgment is granted as to Plaintiff's breach of contract claim involving the absent Exclusive Supply Agreement, but is denied as to Plaintiff's breach of contract claim involving the breach of the NDA.

### d. The GTSA Claims

Count I of Plaintiff's complaint is for misappropriation of trade secrets under the GTSA. Count XII, for injunctive relief, is also predicated on the misappropriation claim. Defendants attack these claims on two fronts: first, they argue that Candy Craft does not have an enforceable trade secret; second, they argue that even if Candy Craft had an enforceable trade secret,

Defendants never misappropriated that secret because it is undisputed that Kwak never saw the entire production process.

### i. Enforceable Trade Secrets

Defendants argue three reasons why Candy Craft does not have an enforceable trade secret. The first, that Candy Craft failed to designate the production process as confidential pursuant to the NDA, was addressed and rejected in Part V.c.ii above. Here, the Court will address the second and third arguments: that Candy Craft failed to take sufficient steps to ensure the secrecy of the alleged trade secrets, and that Candy Craft has failed throughout litigation to identify with particularity exactly what the trade secrets entail.

For a trade secret to be protectable under the GTSA, it must be "the subject of efforts that are reasonable under the circumstances to maintain its secrecy." Ga. Code Ann. § 10-1-761(4)(B).[3] Thus, if a plaintiff cannot demonstrate reasonable efforts to maintain the secrecy of the information, he is not entitled to the GTSA's protection. Bacon v. Volvo Serv. Ctr., Inc., 597 S.E.2d 440, 443 (Ga. Ct. App. 2004).

Employers do not lose GTSA protection by sharing trade secrets "with employees or other confidants who are legally

---

[3] The "reasonable efforts to maintain secrecy" requirement is the second prong of the statutory test for protection under the GTSA. The first is that the information in question "Derives economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use." Ga. Code Ann. § 10-1-761(4)(A). Defendants do not argue that Plaintiffs fail to meet this first requirement, so the Court will not discuss it here.

obligated, by express or implicit agreement or by another duty imposed by law, to maintain its secrecy. Even in such a case, however, the plaintiff must demonstrate that it has taken reasonable efforts to maintain its secrecy by not widely distributing the information to its employees without proper controls." Diamond Power Intern., Inc. v. Davidson, 540 F. Supp. 2d 1322, 1333 (N.D. Ga. 2007). Token efforts to maintain confidentiality alone will not be enough to confer GTSA protection unless the focus of those efforts emphasizes the importance of secrecy. See, e.g., Equifax Servs., Inc. v. Examination Mgmt. Servs., Inc., 453 S.E.2d 488, 493 (Ga. Ct. App. 1994) (holding that having employees sign confidentiality agreements alone is an insufficiently reasonable effort to protect secrecy where the confidentiality agreement did not emphasize the importance of secrecy, among other faults).

Here, Candy Craft did not have any of its employees sign confidentiality agreements. But confidentiality agreements are not required to garner protection under the GTSA. All that is necessary is that the plaintiffs take "reasonable efforts to maintain secrecy," and this Candy Craft has done. Darnall and Judy frequently spoke in code to one another regarding the recipe, even in front of their employees so that no one else would learn it. Judy Dep. 72:1-5, 74:7-13. Also, Judy and Darnall arranged the production of Fondarific so that certain

ingredients were pre-mixed and employees would not have access to the recipe. Id. at 77:18-25.

Defendants counter that Candy Craft did not take reasonable efforts to maintain the recipe's secrecy because it was saved on Darnall's computer or written down in a notebook. However, Defendants have not shown that these files and documents were easily available to Candy Craft's employees. At minimum, there is a material question of fact as to whether Candy Craft took reasonable efforts to maintain the secrecy of its trade secrets.

In addition to being the subject of reasonable efforts to maintain secrecy, a trade secret must also be defined with particularity throughout litigation. Diamond Power, 370 F. Supp. 2d at 1346. Defendants appear to be of the opinion that any failure to define with specificity what constitutes the trade secret results in summary judgment. However, the only case the parties have raised discussing the particularity requirement under Georgia law suggests otherwise. In Diamond Power, the court initially noted that the plaintiff had failed to identify what specific elements about its proprietary sootblower were "trade secrets." Id. But rather than throw up its hands and dismiss the case for this failure alone, the court, on its own initiative, whittled down the plaintiff's designation of trade secrets from "everything" about the sootblower to a few discreet

AO 72A
(Rev. 8/82)

features that were the best candidates to be evaluated for trade secret protection. Id.

Here, the Court need not identify Candy Craft's trade secrets with particularity on its behalf, because it did so in its response to Defendants' First Interrogatories. The trade secrets include:

> (1) Plaintiff's fondant recipes; (2) the identity and quantity of ingredients in Plaintiff's fondant; (3) the formula and process for mixing ingredients for Plaintiff's fondant; (4) Plaintiff's financial data, financial plans, product plans; (5) actual and potential customer lists; (6) pricing information; (7) the identity of equipment and equipment vendors used for manufacturing Plaintiff's fondant; (8) and the identity of Plaintiff's ingredient vendors.

Pl.'s Resp. to Defs.' First Inter, No. 1. Particularly, viewing the evidence in a light most favorable to Plaintiffs, there can be no question that Defendants were aware that secrets (1) through (3) above were trade secrets—these are the secrets which Defendants allegedly went through great efforts to obtain through Kwak in order to help Merlin reverse engineer Fondarific. Thus, there is at least a material issue of fact regarding whether Plaintiffs sufficiently identified their trade secrets with particularity.

### ii. Misappropriation

Defendants' final attack on Plaintiff's misappropriation of trade secrets claim is that Kwak never saw the *entire* production

AO 72A
(Rev. 8/82)

process, and thus could not misappropriate the entire trade secret of the recipe through improper means.

True, the GTSA does expressly require that the misappropriator acquire the trade secret through improper means. Ga. Code Ann. § 10-1-761(2). Furthermore, it is true that "[r]everse engineering of a trade secret not acquired by misappropriation or independent development shall not be considered improper means." Id. § 10-1-761(1). In other words, Georgia law recognizes that "trade secrets may be acquired by others either through independent development or by reverse engineering, and that the acquisition of trade secret information by these means is not improper in the absence of any misappropriation." Essex Grp., Inc. v. Southwire Co., 501 S.E.2d 501, 503-04 (Ga. 1998).

Defendants argue that because Candy Craft maintains that any deviation from its exact ingredients, proportions, and recipe will result in a different fondant, Kwak could not have possibly misappropriated Candy Craft's trade secrets because he did not see the entire production process and, thus, did not know essential steps of that process. However, this argument misses the implication of the cases cited by defendants: it is not improper to acquire trade secrets through independent research or reverse engineering "in the absence of *any* misappropriation." Id. (emphasis added). Conversely, it stands

to reason that independent research or reverse engineering based in part on "any misappropriation" itself may give rise to a claim of misappropriation. And here, the evidence viewed in a light most favorable to Plaintiff could convince a reasonable jury that Defendants, through Kwak, misappropriated certain details of Plaintiff's production process and provided those details to Merlin in order to help it reverse engineer Fondarific. There are sufficient facts in the record requiring the denial of Defendants' motion for summary judgment on Candy Craft's GTSA claims.

### e. Count II: Fraud

Aside from Defendnats' rejected argument in their Motion for Judgment on the Pleadings that the GTSA preempts Plaintiff's state-law fraud claim, the only alternative defense to Count II that Defendants raise in their Motion for Summary Judgment is that Plaintiff failed to produce evidence that it conducted adequate due diligence that could have prevented the fraud. See Dkt. no. 235-1, pp. 38-39.

Plaintiffs alleging fraud under Georgia law must establish five elements: "a false representation by a defendant, scienter, intention to induce the plaintiff to act or refrain from acting, justifiable reliance by plaintiff, and damage to plaintiff." Baxter v. Fairfield Fin. Servs., Inc., 704 S.E.2d 423, 429 (Ga. Ct. App. 2010). However,

> Fraud cannot be the basis of an action if it appears
> that the party alleging the fraud had equal and ample
> opportunity to prevent it and yet made it possible
> through the failure to exercise due diligence. When
> the means of knowledge are at hand and equally
> available to both parties to a contract of sale, if
> the purchaser does not avail himself of these means,
> he will not be heard to say, in impeachment of the
> contract, that he was deceived by the representations
> of the seller.

Middleton v. Troy Young Realty, Inc., 572 S.E.2d 334, 337 (Ga. Ct. App. 2002) (quoting Reeves v. Edge, 484 S.E.2d 498, 501 (Ga. Ct. App. 1997). In Middleton, the plaintiff-homebuyers alleged that the defendant-seller sold them a house that had less square footage than the homebuyers believed. However, because the buyers had noticed several indications that the square footage might not be as high as they originally thought, the court held that they had a responsibility to conduct due diligence to discover the true square footage. Id. at 337-38.

Plaintiffs have produced evidence from the record creating a material issue of fact on each element of claim for fraud. There are several examples to choose from. Particularly, there is evidence that Gartner Studios intentionally kept Judy and Darnall "in their pocket" as the studio was preparing to reverse engineer Fondarific before it "walked away" from the partnership with Candy Craft. Gartner Studios chose this course of action so that Candy Craft would not sign with Gartner Studios' competitors. Such conduct is not covered by the GTSA, and the

AO 72A
(Rev. 8/82)

evidence in the record for this practice, among others, could satisfy the five elements for fraud.

Defendants argue they are nevertheless entitled to summary judgment on the fraud claim because Plaintiffs admitted that they did not do due diligence on Mr. Gartner's background prior to entering into the relationship with Gartner Studios, even though it was Gartner's personal involvement that induced them to enter into the negotiations in the first place. However, the due diligence defense to fraud only applies where "the means of knowledge are at hand and equally available to both parties to a contract of sale." Middleton, 572 S.E.2d at 337. Here, we are concerned with an agreement for ongoing business relations, not a contract for sale. In a contract for the sale of property, it makes sense to place the burden of due diligence on the buyer, who should at least take the precaution of "looking under the hood" or, as in Middleton, inspecting the property before closing a deal. This is especially true when there are indications that the seller's representations are misleading and prudent inspection will necessarily prevent the fraud.

But here, Defendants have shown neither that Plaintiff had "ample opportunity to prevent" or reveal the alleged fraud in this case, nor that some kind of due diligence would have alerted Plaintiff to Defendants' alleged intent to defraud it. Indeed, it would be an odd strategy for Defendants to suggest,

as they must in employing this defense, that proper due diligence on Plaintiff's part would have necessarily produced some evidence of Greg Gartner's alleged propensity to swindle his business partners. While Defendants cannot be faulted for exploring the due diligence defense in this case, the Court does not understand Mr. Gartner to argue that if Plaintiff had looked into his background, it would have found something so nefarious as to cause them to abort the dealings. The due diligence defense to fraud, then, is a poor fit to the circumstances underlying Plaintiff's allegations. Plaintiff has pointed to evidence in the record creating a material issue of fact on the question of fraud, and Defendants' motion for summary judgment on Count II must therefore be denied.

### f. Plaintiff's Damages Claim

Finally, Defendants argue that Candy Craft's claims fail because it has no damages. Particularly, Defendants argue that Candy Craft's expert, J.P. Gringas, based his damages calculation in part on the assumption that the parties would operate under an Exclusive Supply Agreement for at least twenty to twenty-five years. If the Court grants Defendants' motion for summary judgment on Plaintiff's breach of Exclusive Supply Agreement claim (which it has), Defendants suggest that Candy Craft's entire case must fall for failure to prove damages.

AO 72A
(Rev. 8/82)

Here, the expert testimonies regarding damages are detailed enough that the jury can parse out any bases for damages that it deems unfit. Defendants may assist this process through cross examination at trial.

## CONCLUSION

For the reasons stated above, the Objection to the Magistrate Judge's Orders (Dkt. no. 330) is **OVERRULED**; the Motions to Strike the Errata Sheets (Dkt. no. 258) and the Affidavit of Stewart Bromley (Dkt. no. 287) are **DENIED**; Defendants' Motion for Judgment on the Pleadings (Dkt. no. 234) is **GRANTED** as to Counts IV, VI, X, and XI, but **DENIED** as to Counts II, V, VII, VIII, and XIII. Defendants' Motion for Summary Judgment (Dkt. no. 235) is **GRANTED** as to Count III for the breach of contract claim involving an alleged Exclusive Supply Agreement, but **DENIED** as to Counts I, II, III for the breach of contract claim involving an alleged nondisclosure agreement, IX, and XII, and XIV. Thus, the following Counts will proceed to trial: I, II, III (nondisclosure agreement), V, VII, VIII, IX, XII, XIII, and XIV.

AO 72A
(Rev. 8/82)

**SO ORDERED**, this 31ST day of March, 2015.

LISA GODBEY WOOD, CHIEF JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA

AO 72A
(Rev. 8/82)